257
# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DAVID RUFFIN and LEO MONDY III, on behalf of themselves and other Individuals similarly situated, known and unknown, ) ) ) ) | |
| Plaintiffs, ) | Case No. 1:25-cv-07257 |
| ) | |
| v. ) | Judge Sharon Johnson Coleman |
| ) | |
| JCG INDUSTRIES, INC. and REMEDIAL ENVIRONMENTAL MANPOWER, INC., ) ) ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs David Ruffin ("Ruffin") and Leo Mondy III (Mondy) (together, "Plaintiffs"), on behalf of themselves and other individuals similarly situated, known and unknown ("Proposed Class Members"), brought suit against Defendants JCG Industries, Inc. ("JCG")[1] and Remedial Environmental Manpower, Inc. ("REM") (collectively, "Defendants"), alleging violations of the Illinois Minimum Wage Law ("IMWL"), violations of the Illinois Wage Payment and Collection Act ("IWPCA"), and violations the Fair Labor Standards Act ("FLSA"). Before the Court is Defendant JCG's Motion to Dismiss Plaintiffs' Complaint pursuant to Federal Rules of Civil Procedure 12(b)(3) [28] and Defendant REM's Motion to Dismiss Plaintiffs' Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6) [31]. For the following reasons, the Court denies Defendants' Motions.

---

[1] The Court acknowledges that Defendants refer to JCG Industries, Inc. as "JCGI." For consistency purposes, the Court will utilize the acronym used throughout Plaintiffs' pleading, "JCG."

1

**BACKGROUND**

Unless otherwise noted, the following factual allegations are taken from Plaintiff's Second Amended Complaint (hereinafter, "Complaint"), Dkt. 26, and are assumed true for purposes of resolving these Motions. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

**A. Joint Employment Arrangement**

JCG does business under the name Koch Foods and Koch Poultry Co. Inc. Koch Foods is a poultry processer and distributor to retail and grocery stores. To support its operations, Koch Foods operates poultry processing facilities in Illinois and across the country. Two of the Illinois processing facilities, include a plant located at 2219-2199 25th Avenue, Franklin Park, Illinois 60131 ("Franklin Park Poultry Plant") and a plant located at 4404 W. Berteau Avenue, Chicago, IL 60641 ("Chicago Poultry Plant") (together, "Poultry Processing Plants"). REM is an industrial staffing agency that provides temporary and permanent staffing to warehouses and manufacturing facilities. REM supplied workers at the Franklin Poultry Plant and at the Chicago Poultry Plant between March 21, 2022, and the present.

Plaintiff Ruffin worked as an hourly, non-exempt employee at the Franklin Park Poultry Plant. between approximately March 2020 to February 2023. REM paid Ruffin for the work he performed at the Franklin Park Poultry Plant. Ruffin primarily worked Monday through Friday between 6:00 a.m. to 2:30 p.m. or 3:30 p.m. Ruffin also occasionally performed work for Defendants on Saturdays. In one or more individual work weeks in the 3 years prior to the date this Complaint was filed, Ruffin worked 40 or more hours at the Franklin Park Poultry Plant.

Plaintiff Mondy worked as an hourly, non-exempt employee at the Franklin Park Poultry Plant between approximately August 2019 to November 2023. REM paid Mondy for the work he performed at the Frankin Park Poultry Plant from approximately August 2019 to November 2019. JCG paid Mondy for the work he performed at the Franklin Park Poultry Plant from approximately

2

November 2019 to November 2023. Mondy primarily worked a schedule from Monday through Friday between 2:00 p.m. to 11:30 p.m. or 12:00 a.m. At times, Mondy also worked Saturdays. In one or more individual work weeks in the 3 years prior to the date this Complaint was filed, Mondy worked 40 or more hours at the Franklin Park Poultry Plant.

At all relevant times, in performing their job duties, Plaintiffs reported to and were supervised by JCG employees. JCG also supplied Plaintiffs with personal protective equipment, tools, and other equipment necessary to perform their job duties. When these workers work for JCG through third-party entities like REM, the third-party entities jointly hire and fire, supervise and control, set pay, determine hours, and approve the hours worked with respect to these workers.

### B. Unpaid Time Entering the Poultry Processing Plants

Plaintiffs worked with dozens of other hourly paid workers at the Poultry Processing Plants. At the beginning of the workday, Defendants required Plaintiffs and Proposed Class Members to scan an ID badge to enter the buildings. During the winter, the locks on the Franklin Park Poultry Plant would malfunction frequently. When this occurred, Plaintiffs and Proposed Class Members had to call Human Resources to ask someone to open the door and wait outside until a manager came to open the door.     After entering the Franklin Park Poultry Plant, Plaintiffs and other Proposed Class Members scanned their ID badges a second time at a turnstile located directly in front of the Human Resources office. Once through the turnstile, Plaintiffs and other Proposed Class Members next walked to the cafeteria to store their lunch, jacket, and other personal belongings either on a picnic table or in a locker if one was available. After storing their personal belongings in the cafeteria, Plaintiffs walked past the Human Resources and Quality Assurance offices approximately 100 feet to the area where the protective gear table and time clocks were located.

Plaintiffs then waited in line to pick up their assigned protective gear for the day and gloves for the week. The protective gear that Plaintiffs and other Proposed Class Members were required to

wear to be permitted on the Poultry Processing Plants' floors included slip resistant work boots, helmets, hats, hairnets, beard covers, earplugs, glasses, frocks, and gloves. Plaintiffs estimate that they and other Proposed Class Members spent approximately three to fifteen minutes waiting for and donning protective gear before being able to clock in for each shift, except on rare occasions when Defendants temporarily ran out of protective gear and a manager instructed Plaintiffs and other Proposed Class Members to clock in and then wait for protective gear to become available. After donning protective gear, Defendants required Plaintiffs and other Proposed Class Members to wait in a line until a manager directed them to scan their ID badge or undergo a biometric scan to clock in.

Plaintiffs and Other Proposed Class Members routinely waited in a line to clock in because Defendants did not allow them to do so until one to two minutes before the start of their scheduled shift. As a result, Plaintiffs and other Proposed Class Members often had to wait until several minutes after the start of their scheduled shift to clock in. Defendants did not pay Plaintiffs and other Proposed Class Members for the time they were required to be on the Poultry Processing Plants' premises prior to the start time of their scheduled shift, including the time they spent waiting to be let into the building, waiting to pick up and don protective gear, walking within the Poultry Processing Plants, and waiting to clock in. At the end of the workday, Defendants also required Plaintiffs and other Proposed Class Members to "clock out," then walk through the Poultry Processing Plant and remove their protective gear before exiting. Defendants did not pay Plaintiffs and other Proposed Class Members for the time they were required to be in the Poultry Processing Plants after they clocked out.

### C. Unpaid Time During "Lunch"

Defendants scheduled Plaintiffs and other Proposed Class Members for 30-minute unpaid meal breaks during each shift. In practice, however, Plaintiffs and other Proposed Class Members received far less than 30 minutes of uninterrupted meal break time because Plaintiffs and other

4

Proposed Class Members were not allowed to clock out to start their meal break until they were dismissed by a supervisor, who often announced their breaks up to ten to fifteen minutes late without extending their meal break time.

Plaintiffs and other Proposed Class Members were also frequently instructed to clock back in and return to the production floor less than 30 minutes after being dismissed for their meal breaks when a supervisor determined that the poultry materials had not been properly covered or stored prior to the meal break or because there was problem with production that needed to be addressed immediately to avoid spoilation of the poultry products. On those occasions, Plaintiffs and other Proposed Class Members were required to return to the production floor before the end of their 30-minute meal break to secure the poultry so it would remain fit for human consumption.

Plaintiffs and other Proposed Class Members were in contact with poultry and poultry byproducts in the regular course of performing their duties. As a result, they were required to doff their protective and sanitary gear and wash their hands at the start of their meal breaks to avoid spreading bacteria, blood, and other poultry byproducts outside of the production floor. Plaintiffs and other Proposed Class Members were also required to don their protective and sanitary gear and wash their hands before returning to the production floor at the end of their meal breaks to avoid contaminating the poultry products. Through the combination of managers' inconsistent break requirements, and the time employees were required to doff and don their sanitary gear and wash their hands, Plaintiffs and other Proposed Class Members routinely lost between ten and fifteen minutes of their meal breaks.

### D. Purchase of Additional Sanitary Gear

Plaintiffs and other Proposed Class Members were required to wear gloves, hairnets, beard covers, plastic frocks, glasses, earplugs, and similar protective and sanitary gear to be permitted on the Poultry Processing Plants' floors. Defendants provided protective and sanitary gear, including, but not

5

limited to, gloves, hair nets, beard covers, plastic frocks, glasses, and earplugs to workers at the Poultry Processing Plants at the beginning of their shift each Monday. If Plaintiffs and other Proposed Class Members required additional gloves, glasses, or similar protective or sanitary items before the following Monday, Defendants deducted the cost of those items from Plaintiffs and other Proposed Class Members' pay. For example, Defendants deducted $5.00 from Plaintiffs' pay for each set of additional gloves they required each week and $8.00 from Plaintiffs' pay for each set of extra glasses.

Due to the nature of the work they performed at the Poultry Processing Plants, Plaintiffs and other Proposed Class Members frequently needed multiple hairnets, sets of gloves, and earplugs per week because the items would become soiled and were no longer sanitary.

### E. Class Allegations

In the three years prior to the present Action, Defendants employed more than 100 hourly paid workers at the Poultry Processing Plants. Plaintiffs assert that they and the Proposed Class Members are similar to one another because they were subject to the same practices by Defendants: (1) failing to pay overtime wages for time spent on various required activities on the Poultry Processing Plants' premises at the beginning and end of the workday; (2) spending meal breaks predominantly for the benefit of Defendants; and (3) having the cost of necessary sanitary and protective gear deducted from their wages without their consent.

## LEGAL STANDARD

### A. Rule 12 (b)(1)

A motion to dismiss pursuant to Rule 12(b)(1) challenges the Court's subject matter jurisdiction. *Choice v. Kohn Law Firms, S.C.*, 77 F.4th 636, 638–39 (7th Cir. 2023). The party asserting jurisdiction has the burden of establishing it under Rule 12(b)(1). *United Phosphorus Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003). Courts evaluating Rule 12(b)(1) motions may look beyond the

complaint to consider whatever evidence has been submitted on the issue to determine whether subject matter jurisdiction exists. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).

### B. Rule 12(b)(3)

Under Rule 12(b)(3), a party may move for dismissal of an action that is filed in an improper venue. Fed. R. Civ. P. 12(b)(3). In assessing a defendant's motion to dismiss for improper venue, a district court assumes the truth of the allegations in the plaintiff's complaint, unless contradicted by the defendant's affidavits. *Deb v. SIRVA, Inc.*, 832 F.3d 800, 810 (7th Cir. 2016). The district court also may consider evidence outside the pleadings to determine whether the chosen venue is appropriate. *Id.*

### C. Rule 12(b)(6)

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim tests the sufficiency of the complaint, not its merits. *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). When considering dismissal of a complaint, the Court accepts well pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Trujillo v. Rockledge Furniture LLC*, 926 F.3d 395, 397 (7th Cir. 2019). To survive a motion to dismiss, plaintiff must "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

## DISCUSSION

### I. Motions to Dismiss Pursuant to Rule 12 (b)(1)

In its Motion, JCG argues the Court should dismiss Plaintiff's IMWL claims (Count I) and IWPCA claims (Count II) pursuant to Rule 12(b)(1) because the claims are preempted by § 301 of the Labor Management Relations Act ("LMRA") and because Plaintiffs failed to engage in the required grievance procedure set forth in their Collective Bargaining Agreements ("CBA"). (*See* Dkt. 29 at *2.) JCG additionally argues that all three Counts should be dismissed pursuant to Rule 12(b)(3) for

7

improper venue because under the bargained-for terms of the CBAs, the correct venue for all counts is arbitration. (*Id.* at *3.)

In its Motion, REM similarly argues the Court should dismiss Counts I and II pursuant to Rule 12(b)(1) on preemption grounds and because Plaintiffs failed to engage in the required grievance procedure set forth in their CBAs. (*See* Dkt. 32 at *1.) REM also argues that all three Counts should be dismissed pursuant to Rule 12(b)(3) because the correct venue for all counts is arbitration. (*Id.*) REM additionally argues Plaintiffs' FLSA claim (Count III) is subject to dismissal under Rule 12(b)(6) because the FLSA does not require employers to provide meal breaks and because *de minimis* activities such as donning and doffing protective equipment are not compensable under the FLSA.

As an initial matter, the Seventh Circuit recently held that Rule 12(b)(3) "is no longer a permissible means of enforcing arbitration agreements." *Rodgers-Rouzier v. Am. Queen Steamboat Operating Co., LLC*, 104 F.4th 978, 984 (7th Cir. 2024). *Rodgers-Rouzier* recognized that Rule 12(b)(3) is limited to challenges of statutory venue, not the enforcement of an arbitration provision. *See Rodgers-Rouzier*, 104 F.4th at 984. Defendants' Rule 12(b)(3) Motions to Dismiss are improper mechanisms to enforce their arbitration agreements. Accordingly, the Court denies Defendants' 12(b)(3) Motions to Dismiss.[2]

The remaining questions for the Court are whether it should grant JCG's Motion to Dismiss Counts I and II pursuant to Rule 12(b)(1) and grant REM's Motion to Dismiss Counts I and II pursuant to Rule 12(b)(1) and Count III pursuant to Rule 12(b)(6).

1. **Preemption Analysis**

---

[2] The Court makes no determination as to the enforceability of Defendants' arbitration provisions but exclusively determines Defendants cannot enforce such provisions through 12(b)(3) motions to dismiss.

The U.S. Supreme Court has repeatedly held that § 301 preempts "claims founded directly on rights created by collective-bargaining agreements and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'" *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987)); *Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495, 499 (7th Cir.1996). Section 301 entirely preempts state law claims for violations of collective bargaining agreements. *Baker v. Kingsley*, 387 F.3d 649, 657 (7th Cir.2004). However, not every dispute concerning employment that involves a provision in a collective bargaining agreement is preempted. *Id.* To determine whether a state-law claim is preempted, courts look at the "legal character" of the claim: "a question of state law, entirely independent of any understanding embodied in the collective bargaining agreement may go forward as a state-law claim," whereas a claim "sufficiently dependent on an interpretation of the CBA, will be preempted." *Id*; *House v. Illinois Bell Tel. Co.*, 148 F. Supp. 3d 701, 705 (N.D. Ill. 2015) (Durkin, J.). In other words, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for § 301 preemption purposes. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409 (1988).

JCG argues resolving Counts I and II requires interpreting the CBAs, preempting those claims. Specifically, JCG argues that because the JCG CBAs provide greater benefits to Plaintiffs than what is required under state law, an interpretation of those CBAs is required to decide Plaintiffs' overtime claims. (Dkt. 29 at *8.) Ruling otherwise, they argue, "flies in the face of the LMRA and displaces the Union's role as the exclusive representative of its members." (*Id.* at *9.) REM similarly argues Counts I and II are preempted, because resolving them requires interpreting its CBAs. (Dkt. 32 at *4.)

The Court addresses whether resolving Counts I and II requires interpretation of the JCG and REM CBAs, in turn.

### i. Violation of the IMWL (Count I)

9

Governing precedent emphasizes that it is the "interpretation" of a CBA, and not a mere "reference" to a CBA, that warrants preemption. *See In re Bentz Metal Prods. Co.*, 253 F.3d 283, 285 (7th Cir.2001). The Seventh Circuit has held that preemption is not warranted "(1) when the particular [CBA] provision is so clear as to preclude all possible dispute over its meaning; (2) if the parties do not dispute the interpretation of the relevant CBA provisions, or (3) where reference to the CBA is only necessary for computing damages." *Wis. Cent., Ltd. V. Shannon*, 539 F.3d 751, 758 (7th Cir.2008) (internal citations omitted).

JCG asserts, because the Union and JCG already bargained over overtime and each of the terms relates to payment of overtime, resolving Plaintiffs' individual and putative class claims necessarily requires interpreting the JCG CBAs. In Article V, those CBAs provide that:

> Hourly production employees will be paid based on their personal time clock punches. Each employee shall clock in himself or herself immediately before beginning work and clock out himself or herself immediately after completing work in accordance with the Company's timekeeping procedures.

(Dkt. 29-2 at Art. V § 1.) JCG believes the relationship between JCG's CBAs and Plaintiff's overtime allegations are not just superficial; Count I requires that the Court analyze the terms the Union bargained over on behalf of all employees, wage and hour conditions, what "work" is compensable, how and when employees begin accruing compensable time, when compensable time ceases, and when employees are entitled to overtime pay – all of which must be considered by a fact finder to determine if the alleged overtime violations under the IMWL occurred. (Dkt. 40 at 3-4.)

REM similarly argues that the resolution of Plaintiffs' overtime claim is not possible without analyzing the REM CBA. (Dkt. 32 at *5.) Specifically, REM asserts the Court would need to interpret the CBAs to determine whether time spent donning and doffing is the type of work that would entitle Plaintiffs to overtime wages in the first place. *Id.* Article VI of the REM CBA defines the work week and sets employee's entitlement to overtime for "all work" performed in excess of 40 hours per week, sets forth REM's obligation to give reasonable advance notice of overtime work, establishes a break

and lunch policy, and provides that "[e]mployees shall be paid for all hours worked on a weekly basis." (Dkt. 32-2 at Art. VI.) REM argues that although the REM CBA does not expressly define "work," a finder of fact would need to interpret the REM CBA to determine whether donning and doffing time constitutes compensable "work" as to entitle employees to overtime wages. (*Id.* at *6.)

Plaintiffs, by contrast, do not believe that their IMWL claims require interpretation of the JCG or REM CBAs. In their Omnibus Response, Plaintiffs argue that in order to succeed on their claims, they need only show that the they worked more than forty (40) hours in at least one individual workweek, and they were not compensated at a rate of at least one and one-half times their regular rates of pay, 820 ILCS § 105/4a(1); thus, the fact that the CBAs include contractual terms related to overtime is irrelevant to the resolution of Plaintiffs' statutory overtime claim. (Dkt. 36 at *4-5.) Second, Plaintiffs argue that, as the "masters of their complaint," they are free to pursue their statutory IMWL claims—and forgo their contractual overtime claims—regardless of the existence of any greater overtime rights contained in their CBAs. (*Id.* Dkt. 36 at *5.) So long as the resolution of that statutory claim does not require interpretation of the CBAs, they argue, § 301 preemption does not apply. *Id.* Plaintiffs also assert REM's argument that a determination of what work is compensable requires interpretation of REM's CBAs, is without merit, since the Illinois Department of Labor ("IDOL") already defined the term "hours worked" within the context of the IMWL. (Dkt. 36 at *6)

The Court agrees with Plaintiffs that resolution of overtime claims under the IMWL do not require interpretation of the CBAs and that their claims are not preempted under § 301. In the present instance, there is no dispute as to the meaning of any CBA provision governing wages and hours. Plaintiffs simply assert a statutory right to compensation that applies generally to all individual employees. *See Mitchell v. JCG Indus.*, 842 F. Supp. 2d 1080, 1083 (N.D. Ill. 2012) (Dow Jr., J.) (finding plaintiffs could eschew a claim under the CBA and instead assert a state statutory right to compensation). The Court also need not analyze the meaning of provisions the Union bargained over

11

Case: 1:25-cv-07257 Document #: 42 Filed: 02/24/26 Page 12 of 18 PageID #:1172

on behalf of all employees because the IDOL already defines "[h]ours worked" to mean "all the time an employee is required to be on duty, or on the employer's premises …" Ill. Admin. Code, tit. 56, § 210.110. The Court can determine if Plaintiffs worked more than 40 hours in at least one individual workweek without full compensation, without any interpretation of the CBA provisions. At this juncture, any reference to the CBAs would only be necessary to calculate damages, which is not enough to support § 301 preemption. *See*, e.g., *Wisconsin Central, Ltd. v. Shannon*, 539 F.3d 751, 758 (7th Cir.2008); *JCG Indus.*, 842 F. Supp. 2d at 1087.

Since the Court determines Plaintiffs' IMWL claims do not require interpretation of Defendants' CBAs, it denies Defendants Motions to Dismiss these claims on preemption grounds.

### ii. Violation of the IWPCA (Count II)

Section 9 of the IWPCA prohibits employers from taking deductions from an employee's wages unless the deduction meets one of certain statutory criteria. Relevant here, a deduction is not prohibited if it is "to the benefit of the employee," or "made with the express written consent of the employee, given freely at the time the deduction is made."

JCG argues Plaintiffs' claims for alleged unlawful deductions arise out of and require interpretation of the JCG CBAs. (Dkt. 29 at *8.) According to JCG, Plaintiffs' claim that JCG lacked proper authority to make such deductions for additional "sanitary and protective" equipment is contrary to the express language in the JCG CBAs, which authorizes this very practice:

> The Union shall fully cooperate with the Company in enforcement of reasonable health and safety rules. The Company agreed to allow employees to purchase, at reduced price, protective clothing directly from the Company and allow employees to make weekly payments through payroll deductions.

(Dkt 29-2 at Art. XIII § 1.) JCG believes this language proves that the relevant statutory criteria are met because these deductions are for the benefit of the employee, since they are offered at a discounted cost and because Plaintiffs' Union, in its role as JCG employees' exclusive bargaining representative, negotiated this arrangement in the JCG CBAs, which is adequate to provide written consent. (*Id.* at

*9.) Finaly, JCG asserts its deductions where contractually allowed and thus proper under Illinois law. (*See* Dkt. 40 at *6.)

REM similarly argues Plaintiffs' state law claims for improper pay deductions are preempted because the REM CBA includes a provision that requires REM to "comply with all applicable Federal and State statutes relating to employment." (Dkt. 32-2 at Art. IX.) REM argues that because Plaintiffs' IWPCA claim is clearly an allegation that REM failed to comply with applicable state law relating to pay deductions, the claim is substantially dependent on analysis of the REM CBAs. (*Id.* at *6.) Second, REM emphasizes that the REM CBA reserves to management "the exclusive right to take any action it deems appropriate in the management of the employees and direction of the workforce in accordance with its judgment" including "the provision of safety and protective gear to its employees." (*Id.* at *6-7.) REM argues, because Plaintiffs' IWPCA claim is founded on REM's implementation of a management policy related to employee safety, resolution of the claim will require interpretation of the REM CBAs. (*Id.* at *7.)

Plaintiffs argue that JCG's deductions are in violation of § 9 of the IWPCA because Defendants failed to obtain contemporaneous consent from Plaintiffs prior to making the deductions. (Dkt. 36 at *9.). They argue, because Plaintiffs' IWPCA claims are clearly grounded in state law and because the CBAs never touch on the process for obtaining employees' contemporaneous consent for wage deductions, resolution of Plaintiffs' IWPCA claims do not require interpretation of the CBAs. (*Id.*) Plaintiffs additionally argue any "vague reference to an employer's agreement to comply with federal and state statutes in the REM CBA does not result in Section 301 preemption" since Defendants' "duty to comply with federal and state statutes is wholly independent of any CBA.". (*Id.* at *10.) Finally, Plaintiffs argue determining whether the management provisions in the REM CBA preempt Plaintiffs' IWPCA claims, would require the Court to accept that the REM CBA improperly

13

permits REM to contract around state laws prohibiting employers from making deductions from their employees' pay absent certain enumerated circumstances. (*Id.*)

The Court agrees with Plaintiffs that resolution of their IWPCA claims do not require interpretation of the CBAs and are not preempted under §301. Because Plaintiffs claims arise independently out of § 9 of the IWCPA, the Court does not need to interpret the CBAs to resolve Plaintiffs' IWCPA claims. The Court is unpersuaded by JCG's arguments against the merits of Plaintiffs' claims. First, JCG's contention that deductions were "to the benefit of the employee because the items are offered at a discounted cost" runs counter to Plaintiffs' allegations that they were required to purchase the equipment at issue to even be permitted on the Poultry Processing Plants' floors and to avoid contaminating the poultry products. It also runs counter to Plaintiffs' allegations that, in the regular course of their job duties, they routinely needed to purchase additional gear to maintain proper sanitary conditions. Second, JCG's argument that the Union provided consent for these deductions is inapposite. The Supreme Court has repeatedly held that parties to a labor agreement may not contract for something that is illegal under state law. *See Spoerle v. Kraft Foods Global, Inc.*, 614 F.3d 427, 430 (7th Cir. 2010) ("nothing that labor and management put in a collective bargaining agreement exempts them from state laws of general application."); *see also Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985) (stating [§] 301 does not grant parties to a collective-bargaining agreement the ability to contract for what is illegal under state law). Defendants did not and cannot point to any express written consent from Plaintiffs for deductions. This consent also could not be provided by the Union, without each employee's contemporaneous consent, since such a practice would be illegal under state law.

The Court is also unpersuaded by REM's arguments for similar reasons. REM's vague references to its agreement to comply with federal and state laws does not preempt Plaintiffs' IWPCA claims. The rights they assert are wholly independent of any contractual agreement, because the parties

14

could not contract for what is illegal under state law. Additionally, because REM failed to point to any express written consent from employees for the deductions at issue, Plaintiffs sufficiently alleged that the deductions run afoul of § 9 of the IWPCA.

The Court determines Plaintiffs' IWPCA claims are not preempted under §301 and sufficiently alleged. Accordingly, the Court denies Defendants' Motions to Dismiss these claims.

### 2. Exhaustion Analysis

If a claim is preempted under § 301, it must be brought under the LMRA, which requires employees to exhaust grievance and arbitration procedures set forth in collective bargaining agreements before filing suit. *See McCoy v. Maytag Corp.*, 495 F.3d 515, 524 (7th Cir.2007). Having determined Plaintiffs' causes of action are brought only pursuant to state law, the Court need not determine if Plaintiffs exhausted the grievance and arbitration procedures outlined in the CBAs.

## II. Motions to Dismiss Pursuant to Rule 12 (b)(6)

Finally, REM argues Plaintiffs' FLSA claims (Count III) are subject to dismissal under Rule 12(b)(6) because the FLSA does not require employers to provide meal breaks and because *de minimis* activities such as donning and doffing protective equipment are not compensable under the FLSA. (Dkt. 32 at *13.)

Under the provision governing overtime pay, 29 U.S.C. § 207(a)(1), plaintiffs must allege facts demonstrating there was at least one workweek in which they worked in excess of forty hours and were not paid overtime wages. *Hirst v. Skywest, Inc.*, 910 F.3d 961, 966 (7th Cir. 2018). The FLSA outlines circumstances when a meal period can be excluded from hours work. A "*bona fide*" meal period, or one where the employee is completely relieved from duty for the purposes of eating regular meals, is not compensable work time.[3] 19 C.F.R. § 785.19(a). Relatedly, the *de minimis* doctrine

---

[3] The Court acknowledges that Plaintiffs must doff their sanitary gear and wash their hands at the start of their meal breaks to avoid spreading bacteria, blood, and other poultry byproducts outside of the

15

allows employers to disregard otherwise compensable work when only a few seconds or minutes of work, beyond the scheduled working hours, are in dispute. *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 176 (7th Cir. 2011). By contrast, an employee must be compensated for a meal period that is not bona fide, or when they are required to perform any duties while eating and must be compensated for "rest periods" that are ordinarily less than 30 minutes. *See* 29 CFR § 785.19. In the present instance, when evaluating whether the alleged work performed by Plaintiff's during their lunch is *de minimi*s, the Court will consider the amount of time spent on the extra work, the practical administrative difficulties of recording additional time, the regularity with which the additional work is performed, and the aggregate amount of compensable time. *See Kellar*, 664 F.3d at 176.

Plaintiffs assert that REM misunderstands Plaintiffs' FLSA claims because, despite REM's assertion that Plaintiffs are seeking to be compensated for their *bona fide* meal breaks, Plaintiffs actually allege their meal breaks were not *bona fide,* at all. (*See* Dkt. 32 at *19.) Specifically, Plaintiffs assert their meal breaks were not *bona fide* because Plaintiffs were never relieved of all duties. They were routinely required to spend approximately ten to fifteen minutes of their meal breaks performing work predominantly for the benefit of Defendants, including: when they were dismissed for their meal breaks late or called back from their meal break early by a supervisor without having their meal break time extended; when they were required to don and doff their protective and sanitary gear; and when

---

production floor, seemingly meaning they cannot eat while performing their routine job functions. The Court will not immediately foreclose their claims, however, since Plaintiffs explicitly state that they routinely went without a *bona fide* break, or a break enumerated as "ordinarily 30 minutes or more," *see* 29 CFR § 785.19; were released at the whim of supervisors 10-15 minutes late with no extension of their meal time; and where, as here, Plaintiffs ostensibly argue the acts of donning and doffing gear and hand washing were done in service of their employer to maintain proper sanitary conditions and to ensure the poultry "remain[ed] fit for human consumption." Because a period of less than thirty minutes, usually does not qualify as a *bona fide* meal break, but instead generally qualifies as a compensable "rest period," *id.*, the Court will not foreclose Plaintiffs' claims without additional development of the record. To the extent Defendants seek to prove *every* meal period Plaintiffs complain of was in fact *bona fide*, they can elucidate evidence supporting that legal conclusion through discovery.

16

they were required to wash their hands at the start and end of their meal breaks to avoid spreading bacteria, blood, and other poultry byproducts outside the production floor. *Id.*

*Mitchell v. JCG Industries* provides guidance for the Court's analysis. In *Mitchell*, line workers at a poultry plant argued the time they spent donning and doffing sanitary gear before and after their half-hour lunch break, constituted compensable work time. *Mitchell v. JCG Industries*, 745 F.3d 837, 838 (7th Cir. 2014). The Seventh Circuit determined plaintiffs' claims failed because the time spent donning and doffing was minimal and because the plaintiffs failed to argue their lunch break was ***not*** *bona fide. Id.* at 839-40. Plaintiffs' present claims, however, differ in material ways from the claims in *Mitchell*. Unlike in *Mitchell*, Plaintiffs argue the meal periods provided by Defendants did not qualify as *bona fide* because they were not free and clear of work and, by contrast, argue their breaks qualified as compensable "rest periods," at best. *See* 29 C.F.R. § 785.18 ("Rest periods of short duration, running from 5 minutes to about 20 minutes … must be counted as hours worked"). Further, Plaintiffs sufficiently allege, unlike the *Mitchell* plaintiffs, the tasks the completed during their "breaks" in sufficient detail to suggest the amount of work at issue here, both per day and in the aggregate, was substantial. *See*, e.g., *Kellar*, 664 F.3d at 177 (15 to 45 minutes of preliminary work was not *de minimis*). Here, Plaintiffs allege they routinely lost between ten and fifteen minutes of their meal breaks performing required tasks without pay and that their meal breaks were spent predominantly for the benefit of Defendants. Thus, Plaintiffs sufficiently alleged their unpaid activities were not *de minimis* as to survive Defendant's Motion. The Court also will not conclude, without further development of the record, that there was absolutely no instance where Plaintiffs' breaks qualified as "rest periods," as opposed to *bona fide* meal breaks, like Defendants suggest.

Accordingly, the Court denies REM's Motion to Dismiss Plaintiffs' FLSA claims pursuant to Rule 12(b)(6).

**CONCLUSION**

For the foregoing reasons, the Court denies both JCG's and REM's Motions to Dismiss Plaintiffs' claims in full [28], [31].

**IT IS SO ORDERED.**

Date: 2/24/2026

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge